UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-23859-CIV-O'SULLIVAN

[CONSENT]

TRANSITO OSORIO TZOC,

      Plaintiff,

v.

M.A.X. TRAILER SALES & RENTAL, INC.,
d/b/a MAX THERMO SALES and MAXIMO
RODRIGUEZ,

      Defendants.

_____/

## ORDER

THIS MATTER is before the Court on the Defendants' Motion for Summary

Judgment with Incorporated Memorandum of Law (DE# 41, 3/24/15).

## BACKGROUND

On November 4, 2013, the plaintiff filed his First Amended Complaint under 29

U.S.C. 201-216 Overtime Wage Violations and Retaliatory Discharge under 29 U.S.C.

215(A)(3) (DE# 8, 11/4/13) (hereinafter "First Amended Complaint") asserting the

following causes of action: federal overtime wage violation (Count I) and retaliatory

discharge (Count II).

On March 24, 2015, the defendants filed the instant motion and a statement of

undisputed material facts. See Defendants' Motion for Summary Judgment with

Incorporated Memorandum of Law (DE# 41, 3/24/15); Defendants' Statement of

Undisputed Material Facts (DE# 42, 3/24/15). The plaintiff filed his response on April 8,

2015. See Plaintiff's Response in Opposition to Defendants' Motion for Summary

Judgment with Incorporated Memorandum of Law [DE 41] (DE# 43, 4/8/15). The defendants filed their reply on April 23, 2015. See Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (DE# 46, 4/23/15). This motion is ripe for adjudication.

## FACTS

Defendant M.A.X. Trailer Sales & Rental, Inc. (hereinafter "M.A.X.") is in the business of selling and renting trucks, trailers and refrigeration units. M.A.X. also performs repair work on and services refrigeration units. Defendant Maximo Rodriguez (hereinafter "Max" or "Defendant Rodriguez") is the President of M.A.X.

In 2006, Plaintiff Transito Osorio Tzoc (hereinafter "plaintiff") crossed the border into the United States and has lived here continuously since that time. See Deposition of Transito Osorio Tzoc (DE# 42-1 at 4, 3/24/15).[1] He does not have a work permit and has not filed for asylum or to stay in the United States on a permanent basis. Id.

On June 10, 2011, the plaintiff began working for M.A.X. See Deposition of Transito Osorio Tzoc (DE# 42-1 at 6, 3/24/15). When the plaintiff spoke to Max, he told him "he needed someone to stay there on [sic] the yard directly." Id.[2] Max showed the

---

[1] The Court will cite to the page numbers automatically assigned by the CM/ECF system when citing to the record.

[2] During his deposition, the plaintiff testified as follows:

**Q. What was the job you were hired for?**

**A. Well, speaking to him directly he indicated to me that he needed someone to stay there on the yard directly.**

Q. Stay there meaning what, live there?

2

plaintiff the trailer where he would be residing and the plaintiff purchased this trailer

from an individual named "Juan" for $400.00. Id. at 6-7. During his employment with the

defendants, the plaintiff lived in that trailer at the job site.

When the plaintiff started working at M.A.X., he washed trailers, trucks and air

conditioning units. See Deposition of Transito Osorio Tzoc (DE# 42-1 at 7, 3/24/15).

Later on, he did welding work. Id. The plaintiff was expected to work from 8:00 AM to

5:00 PM, Monday through Friday with a 15 minute break in the morning and a 45

minute lunch break. Id. at 7-8. On Saturdays, the plaintiff began work at 8:00 AM and

ended at 1:00 or 2:00 PM and would sometimes take a lunch break. Id. at 8. At night,

the plaintiff "kept a lookout behind the office" and turned off the lights on the truck and

the trailers. Id. at 8, 11.[3] He also turned off any air conditioning units that had been left

on. Id. at 11. If the plaintiff did not turn off the lights on truck or the air conditioning

units, he would get punished the next day. Id. at 14. On Sundays, Max would

_____

A. Yes. Living there and taking care of that there.

Deposition of Transito Osorio Tzoc (DE# 42-1 at 6, 3/24/15) (emphasis added). The
defendants dispute that Max or anyone else asked the plaintiff to work at night. See
Sworn Declaration of Maximo Rodriguez (DE# 42-2 at ¶5, 3/24/15) (attesting that he
"never instructed nor authorized [the plaintiff] to work from 9:00p.m. to midnight as a
security guard or perform any other duties at night and neither did anyone else to [his]
knowledge.").

[3] The parties dispute whether the plaintiff performed these nighttime duties at the
defendants' request or with the defendants' actual or constructive knowledge. During
his deposition, the plaintiff testified that he performed these duties at Max' request
because the job site was located in a dangerous area and "people go in to rob."
Deposition of Transito Osorio Tzoc (DE# 42-1 at 8, 3/24/15). In his sworn declaration,
Max stated that he "was unaware that [the plaintiff] was performing any additional duties
at night from 9:00 p.m. to midnight." Sworn Declaration of Maximo Rodriguez (DE# 42-2
at ¶6, 3/24/15).

sometimes call the plaintiff and ask him to open or close the gate for vehicles entering or exiting the job site. Id. at 11.

The plaintiff and Max did not discuss a schedule during which the plaintiff would "watch the area." Deposition of Transito Osorio Tzoc (DE# 42-1 at 8, 3/24/15). The plaintiff took it upon himself to establish a schedule of 9:00 PM to midnight to "look and check out the area" and never reported those hours. Id.; Sworn Declaration of Eunice Lopez (DE# 42-3 at ¶8, 3/24/15).[4] The plaintiff chose 9:00 PM because there was no one else in the yard at that time and Max would stay at work until 7:30 or 8:00 PM. Deposition of Transito Osorio Tzoc (DE# 42-1 at 9, 15, 3/24/15).[5]

No one ever came to the yard between 9:00 PM and midnight to make sure the plaintiff was performing this work. Deposition of Transito Osorio Tzoc (DE# 42-1 at 10, 3/24/15). The plaintiff did not tell Max or anyone at M.A.X. that he was performing this work from 9:00 PM to midnight. Id. at 14.

The plaintiff filled out and signed time sheets. Deposition of Transito Osorio Tzoc (DE# 42-1 at 14, 3/24/15). On these time sheets, the plaintiff did not include the hours he worked patrolling the job site and was never paid by the defendants for this work. Id.

---

[4] The defendants question whether the plaintiff actually patrolled the area at night and have filed the affidavit of another employee, Carlos A. Enciso, who attests that he resided at the job site and never saw the plaintiff performing this additional work nor did they ever discuss this work. See Affidavit of Carlos A. Enciso (DE# 42-4 at ¶¶5-6, 3/24/15).

[5] Carlos Enciso lived in a trailer near the plaintiff's trailer. See Affidavit of Carlos A. Enciso (DE# 42-4 at ¶¶ 2, 5, 3/24/15). According to the plaintiff, Carlos did not patrol the yard with him. Deposition of Transito Osorio Tzoc (DE# 42-1 at 10, 3/24/15). Carlos would stay inside his trailer and fall asleep. He would sometimes get drunk. Id. The parties also dispute the time period during which Mr. Enciso resided at the job site near the plaintiff's trailer.

at 9. According to the plaintiff, he did not report the hours he worked at night because he was not given a time sheet for those hours. Id. at 14. The plaintiff never complained to Max about not getting paid for this extra work. Id. at 9, 13.

In 2012, thieves stole batteries from the job site. Deposition of Transito Osorio Tzoc (DE# 42-1 at 9, 3/24/15). The plaintiff and another individual watched the job site from 1:00 AM to 3:00 AM for an approximate one or two week period[6] following the robbery and were not paid for the additional work they performed watching the area. Id. Max also patrolled the area during that time. Id.

The defendants never provided the plaintiff with any equipment to perform this additional nighttime work. Deposition of Transito Osorio Tzoc (DE# 42-1 at 9, 3/24/15). The plaintiff used his own flashlight at night to patrol the yard. Id. He did not wear a uniform when performing these duties. Id.

The plaintiff filed the instant action on October 23, 2013. On October 26, 2013, the plaintiff left his job with the defendants. Deposition of Transito Osorio Tzoc (DE# 42-1 at 13, 3/24/15); Affidavit of Transito Osorio Tzoc (DE# 43-2 at ¶2, 4/8/15). The plaintiff left his job after a verbal confrontation with Max and a manager named Carlos Alberto.[7] Deposition of Transito Osorio Tzoc (DE# 42-1 at 11, 3/24/15). The plaintiff

---

[6] In his affidavit, the plaintiff attests that he patrolled the job site from 1:00 AM to 3:00 AM for an approximately one-week period. See Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶¶5, 10, 4/8/15). During his deposition, the plaintiff testified that this was a two-week period. See Deposition of Transito Osorio Tzoc (DE# 42-1 at 9, 3/24/15).

[7] In the record, "Carlos Alberto" is sometimes referred to as Mr. Alberto, Carlos or Alberto.

described this confrontation as follows:

> when he received the demand letter, Mr. Maximo with Mr. Alberto, both of
> them called me. They called me. Max was very upset, and this man
> Alberto was also upset. They asked me why I had done this, that he could
> find me no matter where I would go. And Mr. Alberto treated me like as if I
> was cynical.
>
> \*\*\*
>
> That's what was said. So then I asked them what and/or how many hours
> are you required to work here in the United States, because I knew it was
> 40 hours, and the five hours were additional to the 40 hours. I noticed they
> were very upset, so then the next day I knew I had to leave, so then the
> next day I took my things and I left right away.

Id. at 11-12.[8] The plaintiff felt Max was threatening him:

> Q. Who said something about I know how to find you? Tell me about that
> again. What precisely was said about finding you?
>
> A. That's what I understood that Don Max[9] said. I heard it like a threat.
>
> Q. What exactly did he say, to the best of your recollection?
>
> A. When he spoke he seemed very upset. No matter where you go I will
> find you[.] No matter where you go I will find you.
>
> Q. What did you take that to mean?
>
> A. I thought he was very upset. I wasn't sure what he was going to do.

Id. at 12 (footnote added). Max also told the plaintiff that he would file a counterclaim in

excess of $300,000:

> Q. Was he shouting?
>
> A. He was very upset. He said to me that he was going to counterdemand

---

[8] Although the plaintiff initially testified that Max and Mr. Alberto "called" him, he
later clarified that Max had "called [him] in," meaning this conversation took place in
person. Deposition of Transito Osorio Tzoc (DE# 42-1 at 12, 3/24/15).

[9] During his deposition, the plaintiff sometimes referred to Max as "Don Max."

for more than 300,000.

Q. He said that at that time or that was something he said later?

A. No. At that moment, at that moment.

Id. at 12-13. The plaintiff never returned to work after the confrontation. Deposition of Transito Osorio Tzoc (DE# 42-1 at 12, 3/24/15). Max never told the plaintiff that he could not work for the defendants because of the lawsuit. Id.

During his deposition, the plaintiff initially testified that prior to filing the instant action, he had already formed the intent to quit his job because he was dissatisfied with discussions concerning his request for a raise. Deposition of Transito Osorio Tzoc (DE# 42-1 at 13, 3/24/15). Carlos Alberto agreed to provide the plaintiff with a $50 raise, but would also require the plaintiff to start paying rent for residing in the trailer at the job site. Id. The plaintiff was dissatisfied with this arrangement. Id. A week later, the plaintiff resigned. Id.

The plaintiff then contradicted this testimony and testified that he did not make the decision to quit his job until he observed Max and Carlos Alberto's reaction to the demand letter:

Q. How did that make you feel?

A. It made me feel bad because I was always working and doing my job, and that's when I decided to resign.

Q. Why didn't you resign at that time? Why did you wait two weeks, two more weeks?

A. It was a week later when I resigned.

Q. Why did you wait a week later? Why didn't you just resign on the spot?

A. I had not resigned because I didn't know what type of reaction they

were going to have once they received the demand letter.

Q. What difference would that make? **I don't understand. You made the decision to resign when they told you, when Carlos told you about the $50 raise, but you would have to pay rent.**

**A. No. I had not made the decision to resign.**

Q. That's what I understood you to say.

**A. I decided to resign when I saw their attitudes once they had received the lawsuit.**

Deposition of Transito Osorio Tzoc (DE# 42-1 at 11-12, 3/24/15) (emphasis added).

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(a). Rule 56(a) states relevant part, as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). That is, "[t]he moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th

Cir. 1991) (quoting <u>Celotex</u>, 477 U.S. at 323) (internal quotation marks omitted).

In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. <u>Batey v. Stone</u>, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1 (1st Cir. 1997). If the record presents factual issues, the Court must deny the motion and proceed to trial. <u>Adickes</u>, 398 U.S. at 157; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. <u>Celotex</u>, 477 U.S. at 322-323. Consequently, the non-moving party cannot merely rest upon his or her bare assertions, conclusory allegations, surmises or conjectures. <u>Id.</u> As the Supreme Court noted in <u>Celotex</u>:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

<u>Id.</u> at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. <u>Anderson</u>, 477 U.S. at 251; <u>Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

9

<u>ANALYSIS</u>

**1.      Federal Overtime Wage Violation (Count I)**

The FLSA requires employers to pay overtime. <u>See</u> 29 U.S.C. § 207(a)(1).  "An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work." <u>Bailey v. TitleMax of Ga., Inc.</u>, 776 F.3d 797, 801 (11th Cir. 2015) (citing <u>Allen v. Bd. of Pub. Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1314-15 (11th Cir. 2007)). An employer's knowledge of overtime work can be actual or constructive. <u>Allen</u>, 495 F.3d at 1318. "An employer is said to have constructive knowledge of its employee's overtime work when it has reason to believe that its employee is working beyond his shift." <u>Id.</u> at 1319 (citing 29 C.F.R. § 785.11). Moreover, "[t]he employer's knowledge is measured in accordance with his duty . . . to inquire into the conditions prevailing in his business.'" <u>Id.</u> (citations and internal quotation marks omitted).

The defendants argue that they are entitled to summary judgment on the plaintiff's overtime claim because they "did not know [n]or should they have known that Plaintiff was working overtime." <u>See</u> Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law (DE# 41 at 1-2, 3/24/15). The Court disagrees.

In the instant case, the defendants knew the plaintiff was residing at the job site. <u>See</u> Deposition of Transito Osorio Tzoc (DE# 42-1 at 6-7, 3/24/15). Max would sometimes call the plaintiff on his day off (Sunday) and ask him to open and close the gate for trucks that were coming in or leaving the property. <u>Id.</u> at 11. During his deposition, the plaintiff testified that Max told him he needed someone to watch the

property and that was the job he was hired to do:

> Q. What was the job you were hired for?
>
> **A. Well, speaking to him directly he indicated to me that he needed someone to stay there on the yard directly.**
>
> **Q. Stay there meaning what, live there?**
>
> **A. Yes. Living there and taking care of that there.**
>
> ***
>
> Q. Going back to when you first began working for M.A.X. Trailer Sales I want to know more about what you can recall about your first meeting with Max. **You testified that he stated that he needed somebody to stay there at the yard; is that correct?**
>
> **A. Yes**.

Deposition of Transito Osorio Tzoc (DE# 42-1 at 6-7, 3/24/15) (emphasis added). The plaintiff also testified that Max told him to keep a lookout and turnoff the lights at nighttime:

> Q. At that time your primary duty was welding?
>
> A. During the day, yes, **but at night it would change, because he will tell me to keep a lookout behind the office**, to turn off the lights in the truck, to turn off the lights in the trailers.
>
> Q. When did you start performing those duties?
>
> A. From when I started there.
>
> **Q. That was Max that asked you to do that?**
>
> **A. Yes, he would always ask since that's a dangerous area and people go in to rob**.
>
> ***
>
> Q. **But did Max tell you, ever tell you that he wanted you to perform**

**these duties** from nine p.m. to midnight?

A. **Of course, yes. He always told me take care and watch behind the office.**

Q. Well, wasn't it more like since you are living there just keep an eye out? If you hear something call the police, just be aware?

A. Still, regardless, you know, you could not just only stand there. You had to go around and look around and also call.

Q. **So you were expected to patrol the area of the yard?**

A. **Yes, of course, because the area is very big.**

Q. **Who told you to do that?**

A. **First he would tell me to look and watch, and that was a responsibility that he was giving me.**

Q. Okay, but was it your understanding that that was a formal job offer?

A. In my understanding, yes, but then I noticed in the book that it said 11 25 per hour, and then I realized it wasn't like that.

***

Q. Who told you to perform those duties?

A. That was the responsibilities that our boss gave us.

Q. **So Max Rodriguez told you on a nightly basis to go around and make sure the lights were off on the trucks and there were no AC units running?**

A. **Of course.** That is how it was.

Id. at 8-9, 11 (emphasis added).[10]

--------------------------------

[10] In their reply, the defendants argue that "Plaintiff is attempting to create a material issue of fact as to whether Defendants knew or should have known he was working overtime by creating an affidavit that contradicts his deposition testimony." Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary

12

The defendants have submitted evidence denying their knowledge of the plaintiff's nighttime work. In his sworn declaration, Max states that he was "unaware that [the plaintiff] was performing any additional duties at night" and denies instructing or authorizing the plaintiff to perform such work. See Sworn Declaration of Maximo Rodriguez (DE# 42-2 at ¶¶5-6, 3/24/15). The defendants also point to other evidence – like the lack of time sheets and the affidavit of Carlos Enciso – that they never knew or had reason to know about the plaintiff's additional nighttime work. See Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (DE# 46 at 2-6, 4/23/15). The fact that Carlos Enciso (who, like the plaintiff, resided on the property) never witnessed the plaintiff working at night, that the plaintiff never reported his additional nighttime hours on his time sheets and never complained to Max about not receiving overtime compensation, bears on the plaintiff's credibility, not the defendants' entitlement to summary judgment on the plaintiff's overtime claim. "'Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment.'" Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1381 (11th Cir. 2010) (quoting McCormick v. City of Fort Lauderdale, 333 F.3d 1234 (11th Cir. 2003)).

---

Judgment (DE# 46 at 1, 4/23/15). Having read both the affidavit and the deposition, the Court disagrees with the defendants' characterization that the plaintiff's affidavit is contradictory on the issue of the defendants' knowledge. In any event, even without considering the plaintiff's affidavit, the plaintiff's deposition testimony alone is sufficient to create a genuine issue of material fact concerning whether the defendants knew or should have known that the plaintiff worked uncompensated overtime hours for the reasons stated in this Order. Based on the record in the instant case, the Court cannot grant summary judgment for the defendants on the plaintiff's overtime claim.

In their reply, the defendants argue that the instant case is factually analogous to Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306 (11th Cir. 2007). See Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (DE# 46 at 6, 4/23/15). In Allen, the Eleventh Circuit affirmed in part and reversed in part an order granting summary judgment for an employer (a school board) on the plaintiffs' overtime claims. With respect to **some** of the plaintiffs, the Eleventh Circuit reversed the district court because the record evidence showed genuine issues of material fact concerning whether the employer knew or should have known that those plaintiffs were working uncompensated overtime hours. Id. at 1316-19. With respect to three plaintiffs, however, the Eleventh Circuit found that summary judgment had been appropriately entered because no genuine issues of material fact existed where: (1) one of the plaintiffs "testified that she worked unpaid hours when she stayed late, . . . no one told her to work off the clock and she did not inform anyone of her overtime work. She [also] testified that she d[id] not know how the [employer] should have known that she was working without compensation;" (2) another plaintiff "testified that she never told anyone that she had not recorded her time on her time sheets" and put forth no evidence that "school representatives and officials were aware of this work" and (3) a third plaintiff testified "that there must have been time that did not end up on her time sheet because she did not see a difference in her pay when she stayed late to speak with her . . . supervisor." Id. at 1322-23. To the extent the defendants rely on this portion of the Allen opinion, the instant case is factually distinguishable.

Here, the plaintiff testified throughout his deposition that Max told him he needed

someone to stay on the property, told the plaintiff to turn off the lights and the air conditioning units at night and told the plaintiff to watch the job site at night because it was located in a dangerous area. See discussion, supra. Max also occasionally called the plaintiff on Sundays (his day off) and asked him to open the gates for trucks entering or exiting the property. Based on the record evidence in the instant case, there is a genuine issue of material fact concerning whether the defendants had constructive knowledge of the plaintiff's overtime work because they "ha[d] reason to believe that [the plaintiff was] working beyond his shift." Allen, 495 F.3d at 1319 (citing 29 C.F.R. § 785.11).

The fact that the plaintiff here took it upon himself to set his own schedule of 9:00 PM to midnight does not itself establish that the defendants had no reason to know he was performing additional nighttime work for which he was not being compensated. See Allen, 495 F.3d at 1321 (stating that although "[s]ome Plaintiffs did not inform their supervisors of their overtime work . . . an issue of fact nonetheless remain[ed] as to whether the [employer] should be charged with constructive knowledge as to them. . . . We have said that if an employer had an opportunity to acquire knowledge of an employee's work by using reasonable diligence, then the employer can be charged with constructive knowledge.") (citation omitted). "The cases must be rare where prohibited work can be done . . . and knowledge or the consequences of knowledge avoided." Reich v. Dep't. of Conservation & Natural Res., St. of Ala., 28 F.3d 1076, 1082 (11th Cir. 1994) (internal citations and quotation marks omitted).

"To the extent that evidence conflicts at summary judgment, the district court has

an obligation to view all evidence and make all reasonable inferences in favor of the

party opposing summary judgment." Allen, 495 F.3d at 1315 (citations and internal

quotation marks omitted). Construing the facts in the light most favorable to the plaintiff,

there is a genuine issue of material fact concerning whether the defendants knew or

should have known that the plaintiff was working overtime hours for which he was not

being compensated. The defendants' request for summary judgment on the plaintiff's

federal overtime wage violation claim (Count I) is **DENIED**.

**2.     Retaliatory Discharge (Count II)**

Under the FLSA, employers are prohibited from:

> discharg[ing] or in any other manner discriminat[ing] against any
> employee because such employee has filed any complaint or instituted or
> caused to be instituted any proceeding under or related to this chapter, or
> has testified or is about to testify in any such proceeding, or has served or
> is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). "A prima facie case of FLSA retaliation requires a demonstration

by the plaintiff of the following: '(1) she engaged in activity protected under [the] act; (2)

she subsequently suffered adverse action by the employer; and (3) a causal connection

existed between the employee's activity and the adverse action.'" Wolf v. Coca-Cola

Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citing Richmond v. ONEOK, Inc., 120

F.3d 205, 208-09 (10th Cir. 1997)).

The defendants do not dispute the first element, that the plaintiff engaged in a

protected activity by filing the instant FLSA action. See Defendants' Motion for

Summary Judgment with Incorporated Memorandum of Law (DE# 41 at 6, 3/24/15).

Rather, they argue that they are entitled to summary judgment on the plaintiff's

16

retaliatory discharge claim because the plaintiff did not suffer an adverse employment action and cannot meet the causal connection requirement. Id. at 2, 6.

Under Eleventh Circuit precedent, a plaintiff satisfies the causal connection prong by providing sufficient evidence that the decisionmaker had knowledge of the protected activity and that there was a close temporal proximity between this awareness and the adverse action. Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004); see also Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (stating that "the general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."). Here, the plaintiff filed the instant action on October 23, 2013. Three days later, on October 26, 2013, the plaintiff had a verbal confrontation with Max and Carlos Alberto concerning the plaintiff's demand letter. See Deposition of Transito Osorio Tzoc (DE# 42-1 at 13, 3/24/15); Affidavit of Transito Osorio Tzoc (DE# 43-2 at ¶2, 4/8/15). At the very least, the record evidence shows a genuine issue of material fact concerning whether "a causal connection existed between the employee's activity and the adverse action." Wolf, 200 F.3d at 1342-43.

The Court will now address the second prong, an adverse action. In his Amended Complaint, the plaintiff alleges that:

> 17. On 10/26/13, Defendant Maximo Rodriguez began berating and threatening the Plaintiff and pressuring him to dismiss his overtime Complaint.

> 18. In particular, Defendant Maximo Rodriguez indicated the if [sic] Plaintiff did not dismiss his overtime claim, that he would "get" him

wherever he went.

19. Due to the berating and threats, Plaintiff felt compelled to leave his job and therefore was constructively discharged.

*** 

21. The said threatening conduct and constructive discharge as discussed above, is in direct violation of 29 U.S.C. 215 (a)(3), because the motivating factor was Plaintiff's demand for his legally mandated wages and, as a result, Plaintiff has been damaged.

First Amended Complaint (DE# 8 at ¶¶ 17-21, 11/4/13) (emphasis added).

In his response in opposition to the instant motion, the plaintiff argues that he was constructively discharged. See Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law [DE 41] (DE# 43 at 9, 4/8/15) (stating that "Plaintiff was constructively discharged from his job for asserting a claim for overtime wages"). The plaintiff further notes that "[e]ven discriminatory conduct less drastic than firing is sufficient to trigger a retaliation action" under the FLSA and further argues that: "Plaintiff subsequently suffered adverse action by Defendants, his employers, as they began berating and threatening Plaintiff and pressuring him to dismiss his overtime Complaint, thus satisfying the second prong under Wolf." Id. at 11-12. As such, the adverse action supporting the plaintiff's retaliation claim appears to be based on both: (1) Max's[11] threatening conduct and (2) a constructive discharge which arose out of this same threatening conduct. The Court will address the adverse action based on a constructive discharge first.

_____

[11] While the Amended Complaint only alleges Max's conduct, the plaintiff's affidavit also includes Carlos Alberto's conduct. Because Carlos Alberto's conduct does not affect the Court's analysis, the Court will take into consideration the conduct of both Max and Carlos Alberto.

a.      **Adverse Action Based on Constructive Discharge**

Generally, claims of constructive discharge may be asserted as both a substantive discrimination claim and a retaliation claim. In Franklin v. Manatee Cnty Sch. Bd., No. 08:10-CV-02004-T-23AEP, 2011 WL 5420768, at *8 (M.D. Fla. Oct. 18 2011), the court[12] granted summary judgment to an employer on a retaliation claim where the facts asserted by the plaintiff did not rise to the level of a constructive discharge. In Franklin, the court noted: "[the plaintiff] claims that her complaints to management and human resources constituted statutorily protected activity and her constructive discharge constituted a materially adverse action. **Therefore, [the plaintiff]'s claim of retaliation can only succeed if she could establish her claim of constructive discharge**." Id. (emphasis added). The court further noted that because the plaintiff had failed to show a constructive discharge in connection with her substantive discrimination claims,[13] she had also failed to show a constructive discharge on her retaliation claim: "having already found that [the plaintiff] has not met her burden in establishing that she was constructively discharged, the Court finds that [the plaintiff]'s claim for retaliation . . . fails as a matter of law . . . ." Id. As in Franklin, this Court will apply the same definition of a "constructive discharge" to the plaintiff's retaliation claim that it would apply to a substantive claim of discrimination based on a

_____

[12] The Franklin opinion was a report and recommendation adopted in full by the district court in Franklin, 2011 WL 544442, at *1 (M.D. Fla. Nov. 9, 2011).

[13] The plaintiff in Franklin asserted discrimination claims under Title VII, the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act ("FCRA"). Id. at *3. In this Circuit, all three of these claims are analyzed under the same burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

constructive discharge.

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Poole v. City of Plantation, Fla., No. 05-61698-CIV, 2010 WL 4063728, at *7 (S.D. Fla. Oct. 14, 2010) (citing Bryant v. Jones, 575 F.3d 1281 (11th Cir. 2009) quoting Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir.1997)). "In assessing constructive discharge claims, [the Court does] not consider a plaintiff's subjective feelings about his employer's actions, but whether a reasonable person in the plaintiff's position would be compelled to resign." Siudock v. Volusia Cnty Sch. Bd., 568 F. App'x 659, 664-65 (11th Cir. 2014) (alleging constructive discharge under the ADA).[14] "A constructive discharge claim is not a jury question unless a plaintiff presents substantial evidence that employment conditions were intolerable." Id. (citing Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002)).

To support his retaliatory discharge claim, the plaintiff cites heavily to his affidavit filed in opposition to the instant motion. See Affidavit of Transito Osorio Tzco (DE# 43-2, 4/8/15). Again, the defendants argue that "Plaintiff attempts to improperly create material issues of fact through his affidavit" by "embellish[ing] and add[ing] details to his version of his last days at M.A.X. Trailer as compared to his deposition testimony or

---

[14] "To analyze FLSA retaliation claims, courts use the familiar McDonnell Douglas framework applied to retaliation claims under Title VII, the ADEA and the ADA." Urzola v. Thumbelina Learning Ctr. Corp., No. 12-20767-CIV, 2012 WL 3757072, at *5 (S.D. Fla. Aug. 28, 2012) (citation and internal quotation marks omitted);Phillips v. M.I. Quality Lawn Maint., Inc., No. 10-20698, 2010 WL 4237619, at *4 n. 7 (S.D. Fla. Oct. 21, 2010) (noting that "courts routinely examine FLSA retaliation claims under the same standards as Title VII retaliation claims.").

answers to interrogatories." Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (DE# 46 at 7, 4/23/15).

The Court agrees in part with the defendants that the plaintiff's affidavit with respect to the facts giving rise to his retaliation claim is significantly more detailed than his deposition testimony or interrogatory responses concerning these same events. Nonetheless, the Court will not disregard those portions of the plaintiff's affidavit. The law in this Circuit is that an affidavit will not be disregarded as a sham unless there is "some **inherent inconsistency** between [the] affidavit and [the] deposition." Allen, 495 F.3d at 1316 (emphasis added). As the Eleventh Circuit has explained:

> This rule is applied "sparingly because of the harsh effect [it] may have on a party's case." Rollins v. TechSouth, 833 F.2d 1525, 1530 (11th Cir. 1987). Furthermore,
>
>> to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth.
>
> Tippens v. Celotex Corp., 805 F.2d 949, 953-54 (11th Cir. 1986). As such, "our cases require the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." Id. at 954.

Id. (brackets in original). Accordingly, the Court will consider the relevant facts[15] asserted in the Affidavit of Transito Osorio Tzco (DE# 43-2, 4/8/15) in analyzing the plaintiff's retaliation claim.

---

[15] Paragraphs 15 and 16 of the plaintiff's affidavit attests to facts that occurred **after** the plaintiff left his employment with M.A.X. and are therefore not pertinent to the constructive discharge issue. See Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶¶15-16, 4/8/15).

In his affidavit, the plaintiff asserts the following facts to support his claim of

constructive discharge:

> 12.    A few days after Defendants were served with my demand for my overtime wages, my supervisor, Carlos Alberto, came to my trailer looking for me and informed me that Defendant Rodriguez wanted to talk to me. When I arrived at Defendant Rodriguez's office, Defendant Rodriguez was standing at the front door of the office with Carlos Alberto and the painter, Pablo (I cannot recall his last name), and **Defendant Rodriguez started yelling at me asking me "why you did this to me?" Defendant Rodriguez yelled at me that I should have told him at the office and should never have gone out and hired my own attorney. Defendant Rodriguez said he was going to sue me in the amount of $300,000. Defendant Rodriguez continued berating and threatening me and pressuring me to dismiss my overtime claim.** Specifically, **Defendant Rodriguez told me that if I did not dismiss my overtime claim that he would "get" me wherever I went. Defendant Rodriguez was extremely angry at me and continued to yell at me. Then Carlos Alberto started yelling at me and asking me "why have you done what you did to Max?" Carlos Alberto also accused me of acting like a union worker and he was extremely angry at me.** I responded to all those gathered that they had all lived in the United States and was I not entitled to be paid for overtime hours and whether these hours should be paid to me.

> 13. When everyone calmed down, Defendant Rodriguez told me to go with him to his office. Defendant Rodriguez asked me to drop the charges and forget about the lawsuit against him. **Defendant Rodriguez said that if I drop my overtime lawsuit against him then he would pay me $1,000.** I told Defendant Rodriguez that I had already met with my attorney and that I was represented by an attorney now. **I felt extremely uncomfortable and out of place so I also informed Defendant Rodriguez that I was moving out of the trailer I was living in on the yard, because Defendant Rodriguez continued to push the issue.**

> 14. **The following morning, Defendant Rodriguez called me into his office and asked me again whether I was going to stop the overtime claim against him. I felt like I was being interrogated by a police officer and I felt pressured by Defendant Rodriguez.** I again responded that I would contact my attorney to advise me on what I should do.

Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶¶12-14, 4/8/15) (emphasis added).

In essence, the plaintiff attests that Max yelled at him, was "extremely angry,"

threatened to sue him for $300,000, berated him, threatened him by saying that he was

going to "get" the plaintiff wherever the plaintiff went and offered the plaintiff $1,000 to

dismiss the lawsuit. Carlos Alberto also yelled at the plaintiff, was "extremely angry" and

accused the plaintiff of acting like a union worker. The Court finds that these facts are

insufficient to create a genuine issue of material fact concerning whether the plaintiff

was constructively discharged from his employment at M.A.X.

Generally, claims of constructive discharge concern ongoing conduct, rather than

a single, short-term event. See U.S. E.E.O.C. v. Dillard's, Inc., No. 6:07-cv-1496-Orl-

19GJK, 2009 WL 789976, at *13 (M.D. Fla. 2009) (granting summary judgment for

employer on a constructive discharge claim filed by one of the plaintiffs and noting that

"[t]he Court's research indicates that the cases finding instances of a constructive

discharge generally appear to feature long-term, pervasive harassment.") (Title VII

case); see also Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir.

1996) (noting that "[a] constructive discharge will generally not be found if the employer

is not given sufficient time to remedy the situation.") (Title VII case).

In Menzie v. Ann Taylor Retail Inc., 549 F. App'x 891, 895 (11th Cir. 2013) (per

curiam), for instance, the Eleventh Circuit affirmed summary judgment in favor of the

employer on the plaintiff's ADA and FCRA claims finding that a single incident was

insufficient to support an allegation of constructive discharge. The Eleventh Circuit

determined that:

> [the plaintiff] failed to submit evidence of **pervasive conduct** that would
> be sufficient to establish a constructive discharge. She points to a single
> incident in which [a superior] criticized her work performance and disability
> during a forty-five minute one-on-one meeting. Although [the Court did]

23

not condone the statements [the superior] allegedly made, **this single incident [wa]s insufficient to establish the pervasive conduct necessary to show a constructive discharge**. A reasonable person in [the plaintiff]'s situation would not have felt compelled to resign under such circumstances.

Id. (emphasis added; footnote omitted). Similarly here, the plaintiff describes an unpleasant and uncomfortable short-term situation at work which took place over the course of two days before the plaintiff quit his job. See Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶¶12-14, 4/8/15).

Max and Carlos Alberto's actions, as described in the plaintiff's affidavit, are not sufficiently severe or pervasive to create a genuine issue of material fact as to whether the plaintiff was constructively discharged. The threshold for establishing constructive discharge is "quite high." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (ADEA case). "Before finding a constructive discharge, [the Eleventh Circuit] has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991) (quoting Wardwell v. Sch. Bd. of Palm Beach Cnty, Fla., 786 F.2d 1554, 1558 (11th Cir. 1986)); see e.g., Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997) (finding genuine issues of material fact existed on an ADEA constructive discharge claim where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers."). The facts testified to by the plaintiff during his deposition and in his affidavit do not rise to the level of a constructive discharge under the case law.

The Eleventh Circuit has affirmed summary judgment for the employer on

constructive discharge claims in far more antagonizing situations than the one

described in the plaintiff's affidavit and in his deposition. In <u>Sawyer v. Jackson</u>, 505 F.

App'x 890, 892 (11th Cir. 2013), the district court granted summary judgment for the

plaintiff's employer on a claim of constructive discharge.[16] As evidence of constructive

discharge, the plaintiff:

> assert[ed] that she was forced to quit because her direct supervisor made
> a belittling comment regarding her sick leave, told her that he was
> considering further disciplinary action against her following her continued
> failure to perform work duties, once refused to authorize a travel request,
> and once removed her computer from her desk in order to recover a
> document that she had inadvertently deleted.

<u>Id.</u> In affirming the lower court, the Eleventh Circuit concluded that "[e]ven viewed in the

light most favorable to [the plaintiff], these **isolated incidents** are not sufficient to

establish that her working conditions were so onerous or intolerable that a reasonable

person would feel compelled to resign." <u>Id.</u> (emphasis added).

Similarly in <u>Nettles v. LSG Sky Chefs</u>, 211 F. App'x 837 (11th Cir. 2006) (<u>per
curiam</u>), the Eleventh Circuit affirmed a district court's order granting summary

judgment for an employer ("LSG") on Title VII discrimination and retaliation claims

based on a constrictive discharge. The plaintiff in <u>Nettles</u> presented the following

evidence to support his claim that he had been constructively discharged for

complaining about workplace discrimination and harassment:

> (1) LSG undermined [the plaintiff's] authority in front of customers, peers,
> and subordinates; (2) LSG excluded [the plaintiff] from a business

---

[16] In <u>Sawyer</u>, the plaintiff asserted both a retaliation claim and a constructive
discharge claim under Title VII. <u>Sawyer</u>, 505 F. App'x at 891-892. The district court
granted summary judgment for the employer on both claims.

> meeting with [an] LSG chairman . . . and denied [the plaintiff] the
> opportunity to make a presentation at a meeting; (3) LSG denied
> administrative support for [the plaintiff's] staff trip to Puerto Rico; (4) LSG
> evaluated [the plaintiff] as "Fully Meets Expectations" rather than "Fully
> Exceeds Expectations;" and (5) LSG offered [the plaintiff] the position of
> Northeast Sector Vice President on terms and conditions less favorable
> than those offered to other Vice Presidents.

Id. at 839. The Eleventh Circuit "conclude[d] that none of these actions, either

separately or collectively, [met] the threshold level of substantiality needed to show an

adverse employment action or a constructive discharge." Id.

Here, the plaintiff attests that he was threatened, berated and yelled at on two

consecutive dates. The plaintiff further attests that he felt: (1) "extremely uncomfortable

and out of place," (2) "like [he] was being interrogated by a police officer" and (3)

"pressured" by Max. See Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶¶13-14,

4/8/15). However, the test in determining the existence of an adverse action is an

objective one: "whether a **reasonable person** in the plaintiff's position would be

compelled to resign." See Siudock, 568 F. App'x at 664-65 (emphasis added).

To the extent the plaintiff's retaliation claim is based on a constructive discharge,

the record evidence does not show as a matter of law that the plaintiff was

constructively discharged from his employment at M.A.X.

### b.    Adverse Action Based on Alleged Verbal Threats

The Court is also not persuaded that the plaintiff has shown an adverse action

based on the conduct of Max and Carlos Alberto (independent of whether this conduct

amounted to a constructive discharge). "The antiretaliation provision protects an

individual not from all retaliation, but from retaliation that produces an injury or harm."

26

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006) (Title VII case). "For an action to be an adverse action in the context of retaliation, the action 'must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Adams v. City of Montgomery, 569 F. App'x 769, 772 (11th Cir. 2014) (per curiam) (alternation in original) (quoting Burlington, 548 U.S. at 57, 68). Here, the plaintiff has attested to a short-term incident where Max and Carlos Albert yelled at him, berated him and were "extremely angry." Max told the plaintiff he was going to "get" the plaintiff wherever he went. The plaintiff also asserted that Max threatened him with a $300,000 lawsuit and offered him $1,000 to dismiss the lawsuit.

At the outset, the Court concludes that the fact Max and Carlos Alberto were "extremely angry" at the plaintiff, berated him and yelled at him are not adverse actions as a matter of law. See Barnett v. Athens Reg'l Med. Ctr., Inc., 550 F. App'x 711, 715 (11th Cir. 2013) (finding that "neither the reprimands, the negative evaluation, nor the denial of [the plaintiff]'s vacation request were adverse employment actions" where "[t]here was no evidence that [the plaintiff] suffered harm from any action that would have deterred a reasonable employee from making or supporting a charge of discrimination."). "The anti-discrimination statutes do 'not guarantee a stress-free working environment.'" Id. (citing Hipp, 252 F.3d at 1233-34).

The Court similarly concludes that Max's vague threat that he was going to "get" the plaintiff wherever he went without any concrete detail is not an adverse action because it would not dissuade a reasonable worker from asserting his or her rights."The

27

antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington, 548 U.S. at 67. The plaintiff has not shown that he was injured or harmed by Max's vague verbal threat.

Finally, the Court concludes that offering the plaintiff money to dismiss his lawsuit is not an adverse action because it would not dissuade a reasonable plaintiff from asserting his or her rights. It would likely have the opposite effect of encouraging the assertion of workers' rights. These actions individually and collectively do not amount to an adverse action under the case law.

The plaintiff also argues that "[a] reasonable worker would be dissuaded from making or supporting a charge of overtime because such a request could raise legitimate concerns about deportation, loss of employment, etc." Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law [DE 41] (DE# 43 at 12, 4/8/15). However, he points to no record evidence that Max or any other person at M.A.X. threatened the plaintiff with deportation or loss of employment.[17] The Court will not consider arguments that are not supported by the record evidence. At this point in the proceedings, the plaintiff must proffer more than argument of counsel unsupported by the record to survive summary judgment. See So. Solvents, Inc. v. New Hampshire, Ins. Co., 91 F. 3d 102, 104 (11th Cir. 1996) (per curiam) (stating that when the movant meets its burden on summary

---

[17] Although the plaintiff attests that he "feared that [he] may be deported, and this was something [he] had never feared before," Affidavit of Transito Osorio Tzco (DE# 43-2 at ¶16, 4/8/15), he does not assert and the record does not show that anyone at M.A.X. threatened him with deportation.

judgment, "the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial.").

Having considered both the plaintiff's deposition testimony and his affidavit, the Court concludes that the plaintiff has failed to create a genuine issue of material fact concerning whether a reasonable worker would be dissuaded from asserting his rights under the FLSA based on Max and Carlos Alberto's alleged, short-lived verbal mistreatment of the plaintiff and Max's offer of money.

The Court also finds as a matter of law that Max's threat to sue the plaintiff for $300,000 was not adverse action. The plaintiff failed to provide any additional detail concerning this threatened counterclaim. In some instances, an employer's filing of a counterclaim or lawsuit can give rise to a retaliation claim under the FLSA. Darveau v. Detecon, Inc., 515 F.3d 334, 343-44 (4th Cir. 2008). "It is, however, not enough to find a retaliatory motive; **the counterclaims at issue must also be baseless** for this Court to find retaliation." Ramos v. Hoyle, No. 08-21809-CIV, 2009 WL 2151305, at *10 (S.D. Fla. Jul. 16, 2009) (FLSA retaliation claim) (emphasis added); see also Munroe v. PartsBase, Inc., No. 08-80431-CIV, 2008 WL 4998777, at *3 (S.D. Fla. Nov. 20, 2008) (on motion to dismiss "find[ing] that . . . the anti-retaliation claims [were] insufficient as pled because they fail[ed] to allege that the counterclaims lack[ed] a reasonable basis in fact or law."). Here, there is no evidence that Max actually sued the plaintiff and the plaintiff has not alleged or established a fact question on whether the threatened counterclaim would have been a baseless counterclaim. If only baseless counterclaims

can support a retaliation count under the FLSA, the Court fails to see how an unfiled, single threat of a counterclaim would support a retaliation claim.

Based on the foregoing, the defendants' request for summary judgment on the plaintiff's retaliatory discharge claim (Count II) is **GRANTED**.

### 3.    The Plaintiff's Recovery of Back Wages, Front Pay or Liquidated Damages

The defendants also argue that the plaintiff cannot recover back wages, front wages or liquidated damages on his retaliation claim because he is not lawfully permitted to work in the United States. See Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law (DE# 41 at 7-9, 3/24/15). Because the defendants are entitled to summary judgment on the plaintiff's retaliatory discharge claim (Count II), the Court will not address this argument.

### 4.    The Plaintiff's Request for Relief

In his response to the instant motion, the plaintiff asks to the Court enter an Order finding that:

> for the relevant time period: (a) FLSA individual and enterprise coverage (subject-matter jurisdiction) exists; (b) plaintiff was defendants' "employee" under the FLSA; (c) defendants are not entitled to seek any cost credits; (d) no exemptions are applicable in this matter, and, therefore, no evidence needs introduced at trial regarding same . . . .

Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law [DE 41] (DE# 43 at 20, 4/8/15) (capitalization omitted). The plaintiff also argues that "[l]iability has been established and, therefore a [j]ury only needs to determine the amount of damages." Id. at 7.

The plaintiff did not file his own motion for summary judgment and the time for

30

filing such motions has expired under the Court's Trial Order. <u>See</u> Order Setting Pretrial Conference and Trial Date (DE# 39, 12/19/14). Moreover, the record reveals genuine issues of material fact concerning whether the plaintiff was properly compensated for all hours worked. As such, the Court will not enter an Order finding liability on the part of the defendants or granting any of the relief requested by the plaintiff. The parties are free to enter into their own pretrial stipulations concerning the issues raised by the plaintiff in his response to the instant motion or any other issues in this case.

## <u>CONCLUSION</u>

For the reasons stated herein, it is

ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law (DE# 41, 3/24/15) is **GRANTED in part and DENIED in part**. The Court hereby enters summary judgment for the defendants on the plaintiff's retaliation claim (Count II) and denies the defendants' motion for summary judgment as to the federal overtime wage claim (Count I).

DONE AND ORDERED in Chambers at Miami, Florida, this **18th** day of May, 2015.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel on record

31